1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    PHILIP PARKER,                          Case No.  24-cv-02821-JCS

                        Plaintiff,
8
                                             **ORDER GRANTING MOTION FOR**
9        v.                                  **SUMMARY JUDGMENT**

10   CONDUENT HR SERVICES, LLC, et al.,      Re: Dkt. No. 37

                        Defendants.
11

12

13   **I.    INTRODUCTION**

14          Plaintiff Philip Parker brings this employment discrimination action against his former

15   employer, Defendants Conduent HR Services, LLC and Conduent Business Services, LLC

16   (collectively, "Conduent") alleging that he was terminated based on disability. Presently before the

17   Court is Conduent's Motion for Summary Judgment ("Motion").  A hearing on the Motion was

18   held on October 22, 2025.  For the reasons stated below, the Motion is GRANTED.[1]

19   **II.   BACKGROUND**

20          **A.    Factual Background[2]**

21          Parker's employment with Conduent began in 2017, when Conduent was "spun off from

22   Xerox."  Declaration of Philip Parker in Support of Opposition to Defendants' Motion for

23   Summary Judgment, dkt. no. 39-1 ("Parker Decl."), ¶ 4.  According to Parker, he "had been

24   employed continuously by Xerox and predecessor companies acquired by mergers or acquisitions

25   since November 11, 1989, in the same role, and [his] position and responsibilities continued

26

27   _____
     [1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28
28   U.S.C. § 636(c).
     [2] The facts set forth below are undisputed unless otherwise stated.

United States District Court
Northern District of California

without interruption after the transition to Conduent." *Id.* Parker was separated from Conduent on November 11, 2022. Declaration of Ronno Lee in Support of Defendants' Motion for Summary Judgment, dkt. no. 37-5 ("Lee Decl.") ¶ 12. At the time he was separated from Conduent, Parker's annual salary was $215,000, along with a 40% target bonus. Motion Ex. 3, dkt. no. 37-3 (Parker depo. excerpts) at 105-106; *see also* Declaration of Stephen L. Scott in Support of Defendants' Motion for Summary Judgment, dkt. no. 44 (authenticating deposition excerpts supplied by Defendants in support of Motion).

In his declaration, Parker provides a detailed description of his job responsibilities with Conduent, which the Court quotes in full because the nature of Parker's work is relevant to the business reason Conduent has offered to justify his separation from the company:

> 5. Starting well prior to 2019, I worked for Conduent in the wealth group with a variety of responsibilities. My primary responsibilities were as the leader of the Kinetic Application Technology (KAT) group, which was a subgroup of Conduent's Total Benefit Outsourcing (TBO) practice, and as the Wealth Product Leader for the Wealth group. The KAT group designed websites for hundreds of clients some of which were stand-alone products and others were integrated with other technology products in TBO. As Product Leader for the Wealth Practice in TBO I was in charge of Product Development and maintenance for Defined Benefit, Defined Contribution, HSA and Total Rewards for Conduent TBO clients.

> 6. I was the leader of the KAT group from 2000 through 2022 and during that time was the Subject Matter Expert for virtually all Defined Benefit, Defined Contribution, HSA and Total Rewards online systems that Conduent provided to our clients. KAT was aligned under the Wealth line of business and supported multiple lines of business including primarily the Defined Benefit Administration line of business.

> 7. Continuing during the period after 2019, my job title was "Wealth Product Leader."

> 8. As of February 2022, my automatic email signature block at Conduent read:

> Phil Parker EA, MAAA, FCA
> Wealth Product Leader
> Principal: CTPO, KAT, Severance Solution

> 9. CTPO stands for Conduent Technology Product Organization and at various times went by other acronyms including TBO.

> 10. In that capacity, I was responsible for developing and supporting

2

all Products and technology solutions used in Defined Benefit plan administration for corporate clients. This work included building and modifying applications to meet plan design requirements, and integrating those systems with our Total Benefits Outsourcing offerings. From 2000 through 2021 I served as the Subject Matter Expert at all client meetings where we offered, or were offering, Defined Benefit, Defined Contribution, HSA, Severance or Total Rewards technology.

11. I also was the Subject Matter Expert for technology-based Defined Benefit-related client projects, including Terminated Vested Lump Sum Windows, plan terminations, and special compliance updates required by law. I was brought in from the initial meeting with the client to discuss their needs and then all meetings to design, develop and implement the solutions. From 2000 through 2022 I was involved in approximately 70 Terminated Vested Lump Sum Windows.

12. Throughout my tenure, I maintained visibility into the revenue and profit for the KAT group and was in charge of developing financial plans for all new and ongoing Defined Benefit technology work. All groups that I was involved in, including TBO, were profitable for the last full years that I was there. I do not know about profits after I left.

13. Starting in 2007 I also developed and grew the Severance Solutions product. My work relating to Severance Solutions while growing the business up until 2017 was approximately 30% of my time. Subsequent to 2017 the product was mature and the team managed it with little of my time required. From 2019 to 2022 the Severance Solution responsibilities amounted to approximately 1% of my duties, a couple of hours a month. My work as Product Leader within TBO-developing, selling, maintaining, budgeting and managing the Defined Benefit, Total Rewards, KAT and Defined Contribution products-was the ongoing and primary portion of my responsibilities throughout my employment until my termination.

Parker Decl. ¶¶ 5-13.

The official reason given for Parker's separation listed on the HR intake form was Reduction in Force ("RIF"), "Business Reorganization." Lee Decl., Ex. C. The "reason details" on the form state:

This position is being eliminating as a cost reduction. He manages one employee who will be reassigned to another manager at that time. The product lines that he supports are being phased out or will not require this level of support. Work will be redistributed to other existing team members.

*Id.* Parker, however, contends he was terminated based on disability.

Parker was diagnosed with Neutropenia and Evans Syndrome in 2017. Parker Decl. ¶ 14. He states in his declaration that these conditions "led to symptoms of fever, chronic fatigue,

United States District Court
Northern District of California

headaches, and starting in 2021 episodes of fainting." *Id.*   Beginning in 2017, Parker required an injection approximately once every two weeks to treat these conditions and was incapacitated for the entire day of the injection. *Id.*  ¶ 15.  Parker informed his then-manager, Toni Pracilio, of his condition and asked to be allowed to take the whole day off one the days when he received injections and to work extra hours on other days to make up for that time. *Id.*  That request was granted and, according to Parker, his treatments never affected his "productivity or travel requirements to perform [his] job." *Id.*

Parker also took a medical leave of absence from May 5 through 24, 2021 to undergo a splenectomy surgery related to his Neutropenia and Evans Syndrome. *Id.*  ¶ 16.  Parker informed Pracilio that he would be out for surgery and provided her with a letter from his surgeon. *Id.*  According to Plaintiff, Pracilio reported to Michelle Hernandez at that time. *Id.*  However, there is no evidence in the record that Pracilio told Hernandez about Parker's medical leave in May 2021.

Parker states in his declaration that while he was on medical leave in May 2021, "the decision was made to start sending other employees, such as Kim Folkens, to client meetings in [his] place." *Id.*  ¶ 18.  It is unclear from Parker's declaration who is alleged to have made that decision.  According to Parker, "[a]fter [he] returned from leave, [he] noticed that 90% of client meetings [he] would normally attend were being handled by others, such as Ms. Folkens, Shannon Kite, or Peter Amba." *Id.*  He states further that "[a]fter [he] returned, [he] received comments from coworkers such as 'I'll just do this because you're still recovering'" and that these comments continued even after he was fully recovered. *Id.*  ¶¶ 20-21.  When he asked to participate in meetings, his requests were declined. *Id.*  ¶ 22.

In May 2022, Parker had a "medical flare-up due to the Neutropenia and Evans Syndrome and went to the emergency room." *Id.*  ¶ 23.  Parker was hospitalized from May 20, 2022, through June 3, 2022, "due to a stroke, infection, and pulmonary embolisms." *Id.*  He remained on "doctor-ordered disability leave" through July 31, 2022 and returned to work on August 1, 2022. *Id.*  It is undisputed that Pracilio was no longer Parker's supervisor at this point and, although the evidence is unclear as to the exact timing, that Ronno Lee became Parker's direct supervisor during Parker's 2022 medical leave or shortly before that. *See* Parker Decl. ¶ 25 ("On June 1,

1    2022, I received an email from Ronno Lee, who apparently became my manager at that time, at

2    some point during my leave. I was never informed that my manager had changed during my

3    leave."); Lee Decl. ¶ 5 ("I became Parker's direct manager in late 2021 or early 2022. Parker's

4    previous manager was John Menapace.").

5        Because Parker was "still . . . in the hospital . . . or wasn't really available[,]" Lee

6    completed the "paperwork" in May 2022 for Parker to "go out on leave for stroke." Motion Ex. 6,

7    dkt. no. 37-6 (Lee Depo. excerpts) at 26-27; *see also* Parker Decl. ¶ 25 ("It is my understanding

8    that when I went to the hospital initially, Ronno Lee filled out the Conduent paperwork on my

9    behalf for me to go out on leave."). Lee testified that he was made aware of Parker's need to go

10   out on medical leave by a "couple of colleagues that were close to Mr. Parker" but that he "didn't

11   know any of the details around his medical condition." Motion Ex. 6 (Lee Depo. excerpt) at 26.

12   Likewise, Lee states in his declaration that he was "not aware of the specific medical condition

13   that necessitated [Parker's] leave." Lee Decl. ¶ 8. As to Parker's prior medical leave, in 2021,

14   Lee states that "he was not Parker's manager in May 2021" and he does "not recall being made

15   aware of Parker's medical leave at that time." *Id.* ¶ 6.

16       Parker has offered as an exhibit a document that was produced to Conduent by MetLife.

17   Parker Decl., Ex. 103 (Met Life claim form), dkt. no. 39-1 ("Claim Form" or "Exhibit 103"). It

18   appears to include a claim form that was submitted to MetLife, which is "a third-party company

19   whose services Conduent utilizes in connection with employee leaves." *Id.*; *see also* Supplemental

20   Declaration of Dedra Ward in Support of Defendants' Reply to Opposition to Motion for

21   Summary Judgment, dkt. no. 40-1 ("Ward Supp. Decl") ¶ 4. The Claim Form lists the reason for

22   Parker's medical leave as "stroke." Parker Decl., Ex. 103, dkt. no. 39-1 at ECF p. 78

23   (CONDUENT14465). The form lists Lee as "APPROVER1" and Michelle Hernandez as

24   "APPROVER2." *Id.* at ECF p. 96 (CONDUENT14483). However, both Lee and Hernandez have

25   supplied supplemental declarations stating that they did not provide the information in the form to

26   MetLife and that any approval they may have given of Parker's medical leave was "internal to

27   Conduent" as a manager (or second-level manager in the case of Hernandez) and "without access

28   to medical information held by MetLife." Supplemental Declaration of Ronno Lee in Support of

United States District Court
Northern District of California

5

Defendants' Reply to Opposition to Motion for Summary Judgment, dkt. no. 40-2 ("Lee Supp. Decl.") ¶ 4; Supplemental Declaration of Michelle Hernandez in Support of Defendants' Reply to Opposition to Motion for Summary Judgment, dkt. no. 40-3 ("Hernandez Supp. Decl.") ¶ 2. Lee also states that Exhibit 103 was not introduced at his deposition and he had never seen it until it was shown to him by Conduent's counsel in August 2025. Lee Supp. Decl. ¶¶ 2-3. (Hernandez was not deposed).[3] At the motion hearing, Plaintiff conceded that he had no evidence establishing that the information submitted to MetLife, including the information that he had suffered a stroke, was supplied by any Conduent employee. Conduent, in turn, did not dispute that both Lee (Plaintiff's direct supervisor) and Michelle Hernandez (Lee's supervisor) were aware that Plaintiff's leave commencing in May of 2022 was due to a medical condition.

Hernandez was employed by Conduent between January 11, 2021 and May 26, 2023. Declaration of Michelle Hernadez in Support of Defendants' Motion for Summary Judgment, dkt. no. 37-4 ("Hernandez Decl.") ¶ 2. Hernandez "held the position of Vice President General Manager for Conduent's Human Capital Solutions ('HCS') line of business." *Id.* According to Hernandez, "[d]uring the period of [her] employment with Conduent, HCS was undergoing a business reorganization due to a steep and sustained decline in its revenues." *Id.* ¶ 3. Hernandez states that this decline "necessitated that HCS pursue various cost and expense reduction opportunities, including reductions in force ('RIFs'), automation of work, reduction in vendor spending, delaying technical work expenditures, and assessment of capital expenditures." *Id.*

---

[3] Debra Ward, Conduent's Rule 30(b)(6) witness whose title is Senior Director, HR Business Partner, has also supplied a supplemental declaration in support of Conduent's Reply brief that addresses Exhibit 103, stating that it is maintained by MetLife and that Conduent does not have access to it in the ordinary course of business. Ward Supp. Decl. ¶ 3. She further states that the document was not introduced at her deposition. *Id.* ¶ 2. According to Ward, "As part of MetLife's role in administering leaves for Conduent employees, Conduent provides the names of employees' supervisors to MetLife on an ongoing basis, regardless of whether the employee has made a request for leave." *Id.* ¶ 4. She continues, "As such, I am not surprised that Exhibit 103 contains the names of Parker's first- and second-level managers at the time of his 2022 leave, Ronno Lee and Michelle Hernandez. I cannot conclude from this fact that either Ronno Lee or Michelle Hernandez communicated with MetLife." *Id.* ¶ 4. Ward explains that although "managers are the approvers of employee leave at Conduent, . . . they are not privy to any personal health information regarding the employee as part of the approval process. Managers approve leave in an internal Conduent system, which does not provide access to information regarding the employee's underlying health condition." *Id.* ¶ 5.

Likewise, Conduent Senior Director of HR and Rule 30(b)(6) witness Dedra Ward states in her declaration that Conduent's HCS business line "carried out regular RIFs between 2020 and 2025" and that "[t]hese RIFs were one of multiple expense-reduction measures that HCS implemented during this period as part of a business reorganization, which was necessitated by a steep and sustained decline in HCS's revenues on a year over year basis." Declaration of Dedra Ward in Support of Defendants' Motion for Summary Judgment, dkt. no. 37-2 ("Ward Decl."), ¶ 4. Ward has supplied a spreadsheet reflecting that between January 2020 and March 2025, 764 HCS employees were separated from Conduent by RIF and that "RIFs occurred nearly every month during this period." *Id.* ¶¶ 4-5 & Ex. A (RIF spreadsheet); *see also* Ward Supp. Decl., Ex. A (unredacted RIF spreadsheet). In particular, Ward states:

> In 2020, RIFs occurred at least every month and resulted in the separation of over 200 HCS employees. In 2021, RIFs occurred in nearly every month and resulted in the separation of another 171 employees. In 2022, RIFs occurred in nearly every month and resulted in the separation of another 57 employees including Plaintiff Philip Parker . . . . In 2023, RIFs occurred in nearly every month and resulted in the separation of another 161 employees, including Parker's most recent manager, Ronno Lee. Further, one of Parker's former managers, John Menapace, was subject to a RIF, as well as Kim Folkens, who had absorbed some of Parker's duties in 2022.

Ward Decl. ¶ 6.

Another spreadsheet offered by Ward lists the members of the HCS Product Group as of July 2022 and as of May 2023 and shows that "26 employees were part of the HCS Product Group in July 2022 but only 11 remained in May 2023." *Id.* ¶¶ 14-15 & Ex. B (2022/2023 HCS spreadsheet). According to Ward, the HCS product group now has only 3 employees and "most of this reduction was due to RIFs." *Id.* ¶ 15. Ward further states that "[n]o replacement for Parker was ever hired." *Id.* ¶ 16.

According to Hernandez, by late 2021, she had "come to question the business viability" of Severance and Separation Solutions product[4] that Parker had developed beginning in 2007.

---

[4] The briefs and evidence refer to this product variously as "SSS[,]" "the Severance Solutions product[,]" "Severance and Separation[,]" and "Severance and Separation Solutions[.]" At the motion hearing, the parties confirmed that all of these names refer to the same product, which is the product that was initially developed by Parker in 2007.

Hernandez Decl. ¶ 10; Parker Decl. ¶ 13.  On November 7, 2021, Hernandez asked Parker to schedule a time to meet with John Larson and John Menapace to "[e]xplain who does what for Severance & Separation clients (delivery, operations, contracting, invoicing, client-facing activities, product design and maintenance, etc)."; "[e]xplain what tech is being used and who's maintaining that (if different from above)"; and provide a list of "ALL clients who have these services today, their contract renewal dates, and their fees."  Hernandez Decl., Ex. C.

Menapace reported back to Hernandez on November 12, 2021 that he had met with Parker to discuss the Severance Solutions product.  *Id.*  He observed that the "service itself is quite innovative but it is a boutique operation servicing a small market niche. It is not a core service element for our benefits offering."  *Id.*  Menapace also provided a slide deck to Hernandez with an overview of the product. *Id.*  ¶ 7 & Ex. A.  According to Hernandez, one of these slides, "the slide identified as Conduent- 013777[,] lists the annual fees being collected from Severance and Separation Solutions clients in 2021, which add up to $522,000."  *Id.*  ¶ 7. Hernandez points to this slide to support her "recollection" "that during the five years prior to 2021, the revenue associated with Severance and Separation Solutions had peaked at a few million dollars per year" but that by November 2021 "revenue was down."  *Id.*  ¶ 7.

The slide identified by Hernandez reflects that in addition to a "minimum annual fee," clients also paid a "savings based fee" for their use of the Severance Solutions product, which is described in percentages rather than flat dollar amounts.  Hernandez Decl., Ex. A.  Hernandez does not address this fee in her declaration; nor does Conduent mention it in the Motion.  Parker states that Conduent's reliance on the slide is "misleading" because:

> . . . it contains two columns, "Minimum Annual Fee" and "Savings Based Fee." The clients would pay an amount in excess of the minimum annual fee. The total revenue was significantly higher than the $522,000 Hernandez mentions. Severance Solution's revenue is dependent on the economy. During down economic times the revenue would increase into the millions of dollars, during economic times when companies are not laying off employees the revenue is down. Severance Solution was always valued as a hedge product; when other practices struggled during down economic times, Severance Solution would thrive and offset revenue losses of other products.

Parker Decl. ¶ 34.  At the motion hearing, Conduent conceded that there is no evidence in the record reflecting the dollar amount of total revenues obtained from the Severance Solutions

product during the relevant time period, that is, the revenues obtained from *both* the minimum annual fees and savings-based fees.

In a June 27, 2022 business strategy plan, a "Product Roadmap" for 2022-2023, "which sorted HCS offerings into 'Start,' 'Stop,' or 'Continue' columns, 'Severance and Separation' was in the 'Stop' column." Hernandez Decl. ¶ 19 & Ex. L. The entry for Severance Solutions states, "Rationalize proprietary solutions - ACA; Severance and Separation." *Id.*, Ex. L. According to Hernandez, this entry reflected her decision to "sunset" the Severance Solutions product. *Id.* ¶ 19 (reference to "Severance and Separation" in Stop column "reflect[ed] [Hernandez's] decision to sunset the product. More specifically, the plan at this time was to continue existing contracts but not seek new clients or pursue further product development.").

Hernandez "first identified Parker for position or role elimination as part of larger RIFs in the HCS organization" in an HCS business plan dated October 25, 2021. Hernandez Decl. ¶ 11 & Ex. B (Oct. 25, 2021 Business Plan ("October 2021 Business Plan")). In the October 2021 Business Plan, Parker and a number of other individuals were listed under the heading "Planned Q4 Exits." Hernandez Decl., Ex. B. On November 30, 2021, however, Hernandez notified HR that some individuals, including Parker, would not be given notice that they were subject to RIF until January 2022 "due to some projects that were delayed for various reasons." Hernandez Decl. ¶ 11 & Ex. D. According to Hernandez, "[o]ne such project for Parker involved work for Raytheon Technologies, Inc. ('RTX')[,]" as is "reflected in an email from Ronno Lee to [Hernandez] on December 1, 2021, in which Ronno Lee said, 'we will keep Charlie Driscoll and Phil Parker until at least RTX is delivered[ ]' [and Hernandez] responded, 'Confirmed on all the below.'" *Id.* ¶ 12 & Ex. E.

On January 15, 2022, Hernandez emailed Ronno Lee and John Larson with the subject line "People Actions - CONFIDENTIAL." *Id.* ¶ 15 & Ex. F. Hernandez began by saying that "by the end of January, we need a clear position on who will stay and who will go, and when." *Id.*, Ex. F. She explained, "We are being asked for $1.1M in cost savings for 2022" and that she was "expecting <u>MOST</u> of this [to] come[ ] from people actions." *Id.* She listed the individuals she was "anticipating" would be included in the 2022 RIFs, including Parker. *Id.* Parker's separation

dates was described as "END OF MARCH (tentative)."  *Id.*  In a separate email to Liz Sykes, sent on the same day, Hernandez provided a "working RIF list" with projected cost savings for each of the employees on the list; for Parker, the cost savings were projected to be $342,215.50 based on the RIF separation that was "tentatively scheduled" for March.  *Id.*  ¶ 15 & Ex. H.

The next day, Hernandez sent a follow-up email to Lee and Larson in which Parker again showed up on Hernandez's RIF list, with a March 31, 2022 separation date.  *Id.*, Ex. G.  This email, however, expressed specific concerns about certain individuals, including Parker.  In particular, Hernandez stated:

> On some people, the two of you may need to talk through how we cover SA, product owner, and other needs. Some examples...looks like Eric Duval is better than we expected, and maybe Arjun is not as good as we hoped. And for sure having both Angela and Arjun makes no sense. **Phil Parker is also problematic for me (and both of you too). I'm SURE we have others who can step in and cover us "well enough". . . or we can go out and hire someone who can cut it.** We need good business and product people who can think and execute...and also people who can align to the vision and to the team. Everyone else we need to clear out of the way, so we can go faster.

*Id.* (emphasis added). In her declaration, Hernandez offers the following explanation of the language in bold:

> I noted that "Phil Parker is also problematic for me (and both of you too)." By this, I meant that Parker was very highly compensated relative to the revenues of Severance and Separation Solutions and the business and product organization generally. I added that "I'm SURE we have others who can step in and cover us 'well enough' ... or we can go out and hire someone who can cut it." Here, I had in mind that Parker's role was no longer necessary for the business and in particular the product organization, and Parker's functions that needed to continue could be performed by others in the HCS business, including the product team, and on the technology side known as CTPO at a salary level more aligned with the realities of where the HCS business stood. My reference to "someone who can cut it" was not a reference to Parker and his performance; it was a more generalized reference involving others and how the work could be performed. Specifically, Parker's compensation reflected his actuarial skills and experience. However, there had not been a need for actuaries in the business for some time by late 2021.

Hernandez Decl. ¶ 14. Hernandez also states in her declaration that "[a]lthough Parker provided support and worked on other deliverables and offerings within HCS, [Hernandez] understood that Parker's core responsibilities related to a product called Severance and Separation Solutions, which he had played a significant role in developing."  *Id.*  ¶ 6.

Parker disputes Hernandez's statement that actuaries were no longer needed in the HCS business, stating:

> In all client-facing meetings, my status as a credentialed actuary was sought after by Conduent's clients. Having an actuary involved in the projects and products was a differentiator for our clients and prospects. As an actuary, in addition to my product responsibilities, I was able to perform compliance reviews and audits as required by IRS, DOL, and SEC regulations. Conduent realized the value of having a credentialed actuary involved with clients and annually paid for and sent me to 6 Conference of Consulting Actuary meetings in order to maintain my credentials.

Parker Decl. ¶ 31.

In March 2022, Parker again was removed from the RIF list. Hernandez Decl. ¶ 16. Hernandez states:

> I was not eager to separate Parker, and I looked for other opportunities for him. I did this, but with the business in overall decline, the opportunities did not exist, particularly given Parker's compensation level. For example, when March arrived, I was monitoring a new business opportunity that I believed could potentially make it possible to retain Parker. So, in my email dated March 1, 2022, I directed that Parker be "[t]emporarily remove[d] from [the] RIF list, noting a "50/50 [chance] that we may end up retaining this one."

*Id.* & Ex. I. According to Hernandez, however, "the business opportunity that [she] was contemplating in this email did not materialize in the way [she] had hoped." *Id.*

In an April 20, 2022 email, Hernandez suggested that she now planned to go ahead with Parker's RIF but that she was "just holding to notify him until Diane [Conarchy] can be moved" and that Parker would be notified of his separation "ideally within the next 30 days." *Id. ¶* 17 & Ex. J. According to Hernandez, "[t]he reason that Parker's notification was being delayed until after Diane Conarchy's move was based on a financial mandate to reallocate the C09 director level headcount within HCS." *Id.* ¶ 17. Hernandez further states that "Diane Conarchy and Parker performed different roles within HCS. She did not hold any product management responsibilities and did not take on any of Parker's responsibilities. The administrative move was not a 'backfill' for any of Parker's responsibilities but was a 'backfill' solely with respect to headcount." *Id.* There is no evidence in the record establishing when or if Conarchy was moved.

When Parker went out on medical leave on May 20, 2022 (the 30th day after Hernandez's

11

email), he had not been given notice of his separation. On June 2, 2022, Liz Sykes sent an email to Hernandez inquiring about the RIF of Parker and another employee and included a chart that listed Parker's status as "[l]ooking at a late May exit" with a notation that Parker was "already in the RIF intake, we just need to decide the date." *Id.* ¶ 18 & Ex. K. Hernandez responded that "Phil Parker went out on medical leave, so he's on hold until he returns." *Id.*

Parker returned to work on August 1, 2022 and according to Hernandez, at that point "the pre-existing plan to eliminate his position resumed." *Id.* ¶ 20; *see also* Motion Ex. 7 (Ward Depo. excerpts) at 53 (testifying the "final decision" to terminate Parker under the RIF was made in "August or September of 2022"). On August 11, 2022, Hernandez sent Ward "an email listing six employees who would be subject to 'RIF Actions through March 31, 2023,' including Parker." *Id.* & Ex. M.   The email listed Parker's "[t]arget last day worked" as "October 31 (earlier is better)." *Id.* The email stated that the RIF action for Parker had already been submitted to HR and just needed to be "refresh[ed]." *Id.*

On August 18, 2022, Hernandez emailed Ward to provide the justification for the role elimination of multiple employees, including Parker, apparently in response to a request from Ward in connection with RIF paperwork.[5] *Id.*  ¶ 21 & Ex. N. With respect to Parker, whose position is described in the email as "Director, App and Dev Support," Hernandez states:

> o This is not a role aligned to Product Management or any other aspect of the Human Capital Solutions business team.
>
> o This associate built (but does not maintain) a number of custom solutions for clients that are cared for by others in client delivery and in the technology organization.
>
> o There is no place for this associate to move back to CTPO either.
>
> o There are no others in this or an equivalent job code. We had planned to exit him much earlier, but we wanted to fully evaluate his "what" and "how" to see if there was a different role that would be appropriate. Both "what" and "how" are questionable, and so we'll exit him.

*Id.,* Ex. N.

---

[5]The request from Ward is not in the record but appears to be implied from Hernandez's response.

United States District Court
Northern District of California

According to Hernandez, in September 2022, she directed Ronno Lee to "finalize the process to separate Parker." *Id.* ¶ 22. She states that "Parker was separated by RIF in November 2022, and no replacement for Parker was hired."[6] *Id.* She further states that "Parker's job duties were absorbed by others" and that the "ultimate decision to separate Parker was [hers], although [she] worked with Ronno Lee in connection with the decision." *Id.* Finally, she states that "Kim Folkens had no role whatsoever in the decision to separate Parker." *Id.*

## B.    Procedural Background

Parker filed his Complaint against Conduent on January 19, 2024 in Contra Costa Superior Court and on February 28, 2024, he filed a First Amended Complaint ("FAC"), which is the operative complaint. Notice of Removal, dkt. no. 1, ¶ 1; Declaration of Heather Hearne in Support of Defendants' Notice of Removal ("Hearne Decl."), Ex. A, dkt. no. 1-2 (FAC). In the FAC, Plaintiff asserts the following claims: (1) disability discrimination in violation of the Fair Employment and Housing Act ("FEHA"), Cal. Gov't. Code § 12940(a) ("Claim One"); (2) failure to provide reasonable accommodation in violation of FEHA, Cal. Gov't Code § 12940(m)(1) ("Claim Two"); (3) failure to engage in good faith interactive process in violation of FEHA, Cal. Gov't Code § 12940(n) ("Claim Three"); (4) retaliation in violation of FEHA, Cal. Gov't Code § 12940(m)(2) ("Claim Four"); (5) failure to prevent discrimination, harassment, and/or retaliation in violation of FEHA, Cal. Gov't Code § 12940(k) ("Claim Five"); and (6) wrongful termination in violation of public policy ("Claim Six").

---

[6] In the First Amended Complaint, it is alleged that on his last day of work (November 11, 2022), Parker "checked the job board and saw that the company was internally hiring for the same position he had just been terminated from." FAC ¶ 23. In the Ward Declaration filed in support of the Motion, Ward appears to address this allegation, stating:

No replacement for Parker was ever hired. I have seen the job posting for "HRIS Product Owner" that Parker produced and identified as Parker-000410-13, which is attached hereto as Exhibit C. The requisition that led to this posting was not a replacement for Parker. On the contrary, the requisition was not even in HCS. It was an entirely different job in an entirely different Conduent organization at a substantially lower salary.

Ward Decl. ¶ 16. At the motion hearing, Plaintiff conceded that he had no evidence that the job listing Parker remembers seeing was for Parker's job and not a different job, in a different department with a lower salary.

Parker did not serve the original complaint on Conduent and served the FAC on Conduent on April 10, 2024. Notice of Removal ¶ 1.  Conduent timely removed to this Court asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).

### C.    The Motion

In the Motion, Conduent asserts that all of Parker's claims must be dismissed because it has established, as a matter of law, that it had a legitimate business reason for separating Parker and Parker has not pointed to evidence sufficient to demonstrate a fact question with respect to his prima facie case of discrimination or that the reason offered by Conduent for terminating him was pretextual. Conduent further asserts that Parker cannot maintain a claim for failure to provide reasonable accommodation (Claim Two) or failure to engage in the interactive process (Claim Three) because "he admits that Conduent granted every accommodation that he requested without issue and never discouraged him from requesting or using any accommodation."  Motion at 4.

In his Opposition, Parker states that he is abandoning Claims Two and Three but asserts that as to the remaining claims there are sufficient disputed facts related to pretext to preclude summary judgment. Opposition at 2.

## III.    ANALYSIS

### A.    Legal Standards Under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'"  *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive

1    evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty*

2    *Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of identifying, with

3    reasonable particularity, the evidence that precludes summary judgment.  *Keenan v. Allan*, 91 F.3d

4    1275, 1279 (9th Cir. 1996).

5        A party need not present evidence to support or oppose a motion for summary judgment in

6    a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

7    to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir.

8    2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

9    are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co.,*

10   *Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all

11   reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

12   (2007), but where a rational trier of fact could not find for the non-moving party based on the

13   record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

14   *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

15       **B.    *McDonnel Douglas* Standard**

16       Parker asserts disability discrimination and related claims under FEHA.  Where, as here, a

17   plaintiff has no direct evidence of discriminatory motive[7] the plaintiff may prove discrimination

18   using indirect or circumstantial evidence, under the burden-shifting framework established in

19   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Guz v. Bechtel Nat'l Inc.*, 24 Cal.

20   4th 317, 354−55 (2000) (holding that, because of similarity between state and federal employment

21   discrimination laws, California has adopted the *McDonnell Douglas* approach to claims of

22   discrimination under FEHA).  The *McDonnell Douglas* framework requires the plaintiff to

23   establish a prima facie case of discrimination.  *Hawn v. Exec. Jet Mgmt, Inc.*, 615 F.3d 1151, 1155

24   (9th Cir. 2010).  If the plaintiff establishes a prima facie case, the burden of production, but not

25   persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason for the

26   challenged actions.  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (citing

27

28   ───────────────
     [7] Plaintiff conceded at the motion hearing that he has no direct evidence of disability
     discrimination and therefore, that the *McDonnell Douglas* framework applies.

United States District Court
Northern District of California

1    *McDonnell Douglas*, 411 U.S. 792).  If this burden is met, the plaintiff "must then raise a triable

2    issue of material fact as to whether the defendant's proffered reasons for [the employee's]

3    termination[] are mere pretext for unlawful discrimination."  *Id*.

4         The elements of a prima facie case of discrimination under FEHA are generally set forth in

5    *Guz*:

> The specific elements of a prima facie case may vary depending on
> the particular facts. . .  Generally, the plaintiff must provide evidence
> that (1) he was a member of a protected class, (2) he was qualified for
> the position he sought or was performing competently in the position
> he held, (3) he suffered an adverse employment action, such as
> termination, demotion, or denial of an available job, and (4) some
> other circumstance suggests discriminatory motive.

10   *Guz*, 24 Cal. 4th at 355 (internal citations omitted).  "At summary judgment, the degree of proof

11   necessary to establish a prima facia case is minimal and does not even need to rise to the level of a

12   preponderance of the evidence."  *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (citing

13   *Wallis v. J.R. Simplot Co*., 26 F.3d 885, 889 (9th Cir. 1994)) (internal quotation marks omitted).

14        To establish pretext, the employee must offer "specific, substantial evidence of [it]."

15   *Wallis*, 26 F.3d at 890 (quoting *Steckl v. Motorola*, 703 F.2d 392, 393 (9th Cir. 1983)) (internal

16   quotation marks omitted).  Evidence of pretext must be considered cumulatively.  *Chuang v. Univ.*

17   *of Cal. Davis, Bd. of Trs*., 225 F.3d 1115, 1129 (9th Cir. 2000).  "The plaintiff may show pretext

18   either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by

19   showing that the employer's proffered explanation is unworthy of credence because it is

20   inconsistent or otherwise unbelievable."  *Dominguez-Curry v. Nev. Transp. Dept*., 424 F.3d 1027,

21   1037 (9th Cir. 2005) (citing *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1220–22 (9th Cir.

22   1998)).  An employer's nondiscriminatory reason is not rebutted where "the employee simply

23   show[s] the employer's decision was wrong, mistaken, or unwise."  *Horn v. Cushman &*

24   *Wakefield Western, Inc*., 72 Cal. App. 4th 798, 807 (1999).

25        **C.    Disability Discrimination (Claim One)**

26        Conduent does not dispute that Parker was qualified for his position or that he was subject

27   to an adverse employment action.  Further, it assumes for the purposes of the Motion that Parker

28   meets FEHA's definition of disability.  Motion at 14 n. 22.  It challenges Parker's discrimination

United States District Court
Northern District of California

claim solely on the ground that Parker cannot establish that his termination was motivated by discriminatory intent. Conduent has offered a legitimate, non-discriminatory reason for terminating Parker, namely the need to cut costs in the face of declining revenues. Thus, the question the Court must decide is whether Parker provided sufficient evidence from which a reasonable jury could find that Conduent's explanation for his firing was untruthful or pretextual. *See Guz*, 24 Cal.4th at 356.[8] This question presents a close call as there are disputed facts that relate to the reasons Conduent has offered from terminating Parker. Considering the record as a whole, however, the Court concludes that Plaintiff has failed to identify "specific and substantial" evidence of pretext.

In *Guz*, the California Supreme Court cautioned that "[i]nvocation of a right to downsize does not resolve whether the employer had a discriminatory motive for cutting back its work force, or engaged in intentional discrimination when deciding which individual workers to retain and release." 24 Cal. 4th at 358. Further, "in an appropriate case, an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions." *Id.* at 363. On the other hand," summary judgment for the employer may . . . be appropriate where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred." *Id.* at 384-385. That is the case here.

To establish discriminatory intent, Parker points to the fact (which is undisputed) that the final decision to terminate him was not made until August or September of 2022, soon after he returned from medical leave. California courts have held that "temporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual." *Loggins v. Kaiser Permanente Internat.*, 151 Cal. App. 4th 1102,

---

[8] The Court assumes that Parker has made a prima facie case of discrimination but need not decide that question.

United States District Court
Northern District of California

1112 (2007).  Thus, Plaintiff must also show that there is "something more" that establishes that business reason offered by Conduent is pretextual.

Parker points to at least three factual disputes relating to Conduent's proffered justification for terminating him.  First, there are disputes related to the revenues Conduent was earning from the Severance Solutions product at the time Parker was terminated: Conduent asserts that it was considering sunsetting the Severance Solutions product, pointing to the reduced revenues from the product.  Parker, on the other hand, states in his declaration that revenues from that product were significantly higher than Conduent suggests in its motion papers, which do not take into account the savings-based fees paid by clients.  Second, there are disputes related to how significant Parker's work on the Severance Solutions product was, with Hernandez stating in her declaration that she believed that product was Parker's core responsibility and Parker stating his work on that product constituted only 1% of his responsibilities.  Third, the evidence is mixed as to whether Conduent was receiving value from Parker's actuarial skills at the time of his termination (as Parker states in his declaration) or not (as Hernandez states in her declaration).  The Court concludes that these factual disputes, even drawing all reasonable inferences in favor of Parker, do not show that Conduent's reasons for terminating Parker are implausible or baseless and do not constitute "specific and substantial evidence" of pretext.

First, while Hernandez in her declaration (and Conduent in the Motion) may have understated the revenue that the Severance Solutions product was generating in 2021 and 2022, Parker has pointed to no evidence in the record that Hernandez was not considering "sunsetting" the product as a cost-cutting measure in 2021 and 2022.  To the contrary, email communications in November 2021 indicate that Hernandez was, in fact, considering just that.  *See* Hernandez Decl., Ex. C.  Even if it is true that Hernandez underestimated the revenues that were being generated by that product, evidence that a business decision was incorrect or unwise is not sufficient to establish pretext.  *See Guz,* Cal. 4th at 358 (citing with approval *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir. 1994) for the proposition that "issue is discriminatory animus, not whether employer's decision was 'wrong or mistaken,' or whether employer is 'wise, shrewd, prudent, or competent'").

Similarly, it may be that Hernandez was incorrect in believing that Parker's "core" responsibility was the Severance Solutions product but it is undisputed that Parker created that product and "ran the Severance Solution[s]practice." Motion Ex. 3 (Parker Depo.) at 41. Furthermore, Hernandez acknowledges in her declaration that Parker also "provided support and worked on other deliverables and offerings within HCS." Hernandez Decl., ¶ 6. More importantly, Conduent does not justify Parker's RIF solely based on the possible sunsetting of the Severance Solutions product. Rather, it asserts that Parker was subject to the RIF because of declining revenue from the entire HCS division, of which Parker was a part, and because he was a highly compensated employee. Hernandez Decl. ¶¶ 4, 14 ("Parker was very highly compensated relative to the revenues of Severance and Separation Solutions *and the business and product organization generally.*") (emphasis added). Parker does not dispute that he was highly compensated or that Conduent was undergoing reorganization to cut costs, including extensive RIFs to employees of HCS. Therefore, the Court concludes that conflicting evidence as to the significance of his responsibilities with respect to the Severance Solutions product does not constitute substantial evidence of pretext.

This conclusion finds further support in the uncontroverted evidence that Hernandez had, at least tentatively, decided to RIF Parker as early as October 2021, when Hernandez included Parker on a RIF list that was part of the October 2021 Business Plan. Hernandez Decl. ¶ 9 & Ex. B (October 2021 Business Plan). While Parker's RIF was delayed, according to Hernandez, pending completion of a project Parker was working on and again when Hernandez was pursuing a business opportunity that would have allowed Conduent to retain Parker, the fact that Hernandez had included Parker on a RIF list at least six months before she was aware of any medical leave taken by Parker, that she temporarily removed him from the list or delayed his separation for specifically identified business reasons, and then added him back onto the RIF list just before Parker went on medical leave, significantly undercuts Parker assertion that Conduent's justification for terminating him is not credible. *See Stetsyk v. Kelly Mitchell Grp., Inc.*, No. 2:20-CV-03941-FLA (RAOX), 2021 WL 12302250, at *12 (C.D. Cal. Apr. 16, 2021) (granting summary judgment in favor of the employer on a FEHA disability discrimination claim where

there was no evidence that the plaintiff had told his employer about his disability before the decision to terminate him was made).

Finally, while there is a factual dispute regarding whether Parker's actuarial skills were of value to Conduent by 2021, that dispute is not sufficient to establish pretext. The Court notes that there is no contemporaneous evidence that Conduent relied on this particular justification at the time it terminated Parker. Moreover, Hernandez's reference to Parker's actuarial skills in her declaration appears to be offered mainly to explain *why* Parker was highly compensated. Hernandez Decl. ¶ 14 ("Parker's compensation reflected his actuarial skills and experience"). As there is no dispute that Parker was, in fact, a highly compensated employee, or that Conduent had decided as a business matter that it needed to reduce costs through RIFs of HCS employees, any dispute about the value of Parker's actuarial skills to Conduent is too tangential to constitute substantial evidence of pretext.

For these reasons, the Court concludes Parker has not carried his burden under the *McDonnell Douglas* framework as to his discrimination claim. Therefore, summary judgment on Claim One is GRANTED.

### D. Retaliation (Claim Four)

To prevail on his retaliation claim, Parker must establish the following elements: 1) he engaged in a protected activity; 2) Conduent subjected him to an adverse employment action; and 3) a causal link exists between the protected activity and adverse action. *See Yanowitz v. L'Oreal USA, Inc*., 36 Cal.4th 1028, 1042 (2005). FEHA Retaliation claims, like discrimination claims, are subject to the *McDonnell Douglas* burden shifting framework. *Id.* Conduent contends it is entitled to summary judgment on Parker's retaliation claim because he cannot meet the "causal link" requirement. The Court finds that Parker fails to meet his burden under *McDonnell Douglas* on his retaliation claim for the same reason his discrimination claim fails, discussed above. Therefore, the Court GRANTS the Motion as to Claim Four.

### E. Failure to Prevent Discrimination (Claim Five)

Under FEHA, it is unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k) ("Section

12940(k)"). To prevail on a claim under this section, a plaintiff must show: "(1) plaintiff was subjected to discrimination, harassment, or retaliation, (2) defendant failed to take all reasonable steps to prevent discrimination, harassment, or retaliation, and (3) this failure caused plaintiff to suffer injury, damage, loss, or harm." *Andrade v. Arby's Rest. Grp., Inc*., 225 F. Supp. 3d 1115, 1131 (N.D. Cal. 2016) (internal quotes and citation omitted). "No liability lies for failure to take steps to prevent discrimination if no discrimination in fact occurs." *Elkins v. Automatic Data Processing Inc*, No. EDCV21606JGBKKX, 2023 WL 3551864, at *11 (C.D. Cal. Mar. 3, 2023) (citing *Trujillo v. N. Cnty. Transit Dist*., 63 Cal. App. 4th 280, 289 (1998), as modified (May 12, 1998)). Because Parker's discrimination claim fails under *McDonnell Douglas* he also cannot prevail on his claim for failure to prevent discrimination.

Conduent asserts that this claim fails for the additional reason Conduent "had policies in place prohibiting discrimination and establishing procedures for employee complaints regarding the same." Motion at 24 (citing Ward Decl. at ¶¶ 18-20 & Ex. D (Non-Discrimination Policy) at Conduent-009170 (prohibiting disability discrimination); Ex. E (ADAAA Accommodation Policy) at Conduent-009105 (requiring Conduent to make reasonable accommodations); Ex. H (Workplace Practices Policy) at Conduent-009183 (requiring employees to report discrimination); and Ex. I (Investigation of Employee Complaints Policy) at Conduent-009168-69 (requiring investigation of employee complaints; prohibiting retaliation). According to Conduent, because it had policies in place to prevent discrimination, Parker cannot establish the second and third elements of his claim for failure to prevent discrimination, namely, that Conduent failed to take reasonable steps to prevent discrimination and that Parker was harmed by its failure. *Id.*

In his Opposition, Parker argued only that "[b]ecause Plaintiff has established a prima facie case of disability discrimination, there are triable issues as to whether Conduent failed to prevent such discrimination and retaliation." Opposition at 18. This argument relates only to the first required element of his claim for failure to prevent discrimination, however. Because Parker did not address Conduent's arguments as to the second and third elements, or point to any shortcomings in Conduent's practices and procedures for preventing discrimination, the Court concludes that for this additional reason Conduent is entitled to summary judgment on this claim.

1    Accordingly, the Motion is GRANTED as to Claim Five.

2        **F.    Wrongful Termination in Violation of Public Policy (Claim Six)**

3        Parker's claim for wrongful discharge in violation of public policy is derivative of his

4    FEHA claims.  *Tandon v. GN Audio USA, Inc*., No. 21-15312, 2022 WL 1210945, at *2 (9th Cir.

5    Apr. 25, 2022)).  Because the Court finds that Parker's FEHA claims for discrimination and

6    retaliation cannot survive summary judgment, it also finds that his claim for wrongful termination

7    in violation of public policy fails as a matter of law.  Therefore, the Court GRANTS the Motion as

8    to Claim Six.

9    **IV.    CONCLUSION**

10       For the reasons stated above, the Motion is GRANTED.  Plaintiffs' claims are dismissed

11   with prejudice.  The Clerk is instructed to enter judgment in favor of Defendants and close the

12   case.

13       **IT IS SO ORDERED.**

14

15   Dated:  October 23, 2025

16   _____

17   JOSEPH C. SPERO
     United States Magistrate Judge

United States District Court
Northern District of California